of Canada and number 162002, Diane L. Gross of the Sun Life Assurance Co. May it please the Court, good afternoon. Joshua Bacarach, I represent Sun Life, who is the Thank you. This risk of disability case was previously before the First Circuit after the District Court entered judgment in favor of Sun Life. This Court remanded the claim back based on two factors. One was a change in the law on the standard of review, but also the Court wanted the parties to address in more detail the surveillance. The District Court at that time, following the remand, entered judgment in favor of Ms. Gross and we are now appealing that decision. Under Orndorff v. Paul Revere, this Court conducts its own de novo review of the eligibility without deference to what the District Court decided. But it's still important to look at what the District Court decided to know why it was wrong. The District Court in this case said it was giving extra weight to the opinions of those doctors that actually examined Ms. Gross. But why do we care about why the District Court was or was not wrong on some factual assumption? Aren't we just doing it de novo? So don't we just cut to what is the evidence going both ways? I agree. And I will get to that, and that's the major part of it. And I could jump right to it. I just think that for the Court to say that it was relying on the treatment of the examining physicians and relying mostly on Dr. Murphy, who never even examined, shows that that decision was wrong. But you're right, Your Honor. Excuse me, Counselor. I mean, before we bypass the standard of review, Justice Selyer authored an opinion, Stephanie v. Blue Cross, in February or March of this year. Actually, about two weeks ago, Your Honor. Two weeks ago. And I'm sure you noticed that in that case he mentioned that our standard of review is, as he describes it, murky. And he actually cites cases where we've said that our review from a District Court ERISA finding is for clear error on the factual findings. And we definitely have other cases which talk about de novo review. So I imagine that my panel members and I are going to have to pin that down when we talk later. Well, Your Honor, I can address that. And there are two ways to address it. First is, as in Stephanie's seat, it doesn't matter. Because no matter what way you look at it, whether it's abuse of discretion, the District Court clearly erred and the decision is wrong. Or if you look at it de novo, again, we think that we prevail. But the other way to look at it is this. In Orndorff, the same case that I mentioned from this court, it looked at it under summary judgment and said summary judgment's just the vehicle. And that in Orndorff, which arrived to the court the same way this one did on decision on summary judgment, the court said that you make your own decision de novo. And the cases that Judge Celia relied on, and I'm blanking on the name of the first one, I think it was Sulis. But in that case, the parties actually stipulated to the record, and they asked the judge to decide the case on a stipulated record, which is kind of like Rule 52. So if you're in a 52 motion, you're asking the court to make credibility findings, and that's going to be reviewed for abuse of discretion. We never submitted it to the court in that manner. But I think the other thing to look at, Your Honors, is an arrested case is based on administrative records. It's a dry record. There's no live witnesses coming in. So what you have is the district court is in the same position as this court is to evaluate that. There are no real credibility determinations on witnesses as you would with a real trial or a live trial. But isn't a district court just sort of institutionally better than we are at going through a record and balancing and making what are, to a certain extent, factual judgments that they do that every day? We have a bunch of rules and principles that sort of keep us from usually having to do that. So I know both parties briefed, but that was before Stephanie briefed DeNovo, but that was before Stephanie C. came down. It does seem that we're a bit of a fish out of water here when we're doing DeNovo review. Well, I disagree, but I would also like to point out that Orndorff versus Paul Revere is the law of the circuit. It came, obviously, before Stephanie C. So to change the law of the circuit, you have to have an en banc decision. That's my understanding of the court's internal operating procedures. So Stephanie C. doesn't move anything on the law. But I also think that the judges are in as good a place as any on this panel as a district court judge to review the evidence and to make its own determination. Our case law is pretty clear that when there has been no delegation of discretion to the plan administrator, then the district court is in the posture of doing the DeNovo review. It's just that we usually don't do that when the district court has gone through a record and made its findings. Well, the court did in Orndorff. The court did it. And again, Orndorff was on a summary judgment decision, whereas the Solis case that Judge Celia relied on was based on a the parties agreed to have it reviewed based on stipulated record. So we think there is no real discrepancy in the law. The law of the circuit is Orndorff, and it states that when a case is decided under DeNovo review, based on a summary judgment ruling, this court looks at that evidence and makes its own decision. But I think it's important now that we actually look at the evidence. Let me ask you to drop that up on the Court Council. When we remanded previously and talked about the need to evaluate the surveillance evidence in relation to all of the record evidence that was in the case, we thought it was of some importance that the doctors who were evaluating the surveillance evidence understood, at least with respect to a portion of that surveillance evidence, that it was taken at a time when Mrs. Gross was dealing with a medical emergency, and those evaluating the significance of the surveillance evidence should be aware of that fact. Now, just looking at the record as it now comes to us, it's hard for me to tell whether, I think it's clear Dr. Nguyen was aware, there's no question that he was aware of that, but I don't see in this record that Dr. Ross and Dr. Gupta were aware of that medical emergency. Is it your position that they were aware of that when they offered their evaluation? It is unclear to me about Dr. Ross. Why should there be any lack of clarity when we emphasized that we thought that was important, that the doctors offering an evaluation to that surveillance evidence should be aware of that? Well, I agree, but Dr. Gupta was made aware of it, she was, or he was made aware of it. Where do you get that in the record, please? The referral, and I could find it when I sit down, but I know from discussions that went on during the remand that that information was made aware to Dr. Ross. What does that mean, discussions that went on? Well, frankly, it's not in the record. I believe it is, and I will look for it in the record, and if I can't find it in the time when I sit down, I will send it along to the court following the hearing, just to fill in the missing information. But I think the important part here, Your Honor, is it is still Ms. Gross' burden of proving that she was disabled, and this court asked her to do the same things. You pointed out, Your Honor, that she did not have her own doctors address the evidence, and she still didn't. Dr. Egan was the treating doctor, and there's no opinion from the remand. You have to believe they went to Dr. Egan and said, can you look at the evidence and does your opinion change? And if that opinion would have helped the claim, it would be in the file. We'll ask that question as well. And I also think it's important that you look at what Dr. Murphy said. He makes these generalized statements that are false on the medical side of it. He says that he reviewed the records and the surveillance, but then he doesn't bother to describe any of it. He says that he doesn't address the discrepancies with the surveillance, which was the issue this court asked him to do, or the parties to do. Didn't he say that he didn't find the surveillance inconsistent because her symptoms could flare occasionally and be calm on other occasions? He said that the symptoms of reflex sympathetic dystrophy can vary from day to day and minute to minute, and that's wrong. We cite to the Mayo Clinic and other information in our briefs that says that that's not true. Well, that wasn't part of the record, was it? I'm sorry? The Mayo Clinic information wasn't part of the record, was it? Well, this court's allowed to look at references like that when making a decision. A medical issue? A medical issue. We want to be our own experts and go out and make treatises? No, but we've cited, we've provided them to the court. A submission to additional notice of online? Well, you don't need to get to that point, and here's why. She never claimed that her symptoms varied from day to day or minute to minute. Her claim is that it's continuous. Dr. Gupta says that it's continuous symptoms are the hallmark of RSD. Dr. Niren says that RSD is not a part-time condition, that you can't just have exigent circumstances like that one occasion only, and that allows you suddenly to become Superman and do everything that you can't do. And I think, you know, the biggest problem here is, again, Doesn't the record indicate that after that foray to see her hospitalized mother, she was out of sight for two days, doing nothing? We don't know that. It just said she wasn't observed, but we don't know that. I thought it was just a follow-up. I think actually the next day she went to Dr. Yeah, she went to Dr. Bupalam. Bupalam. She went to Dr. Bupalam, and after the examination. He observes her in a pretty, she's in pretty bad shape when she goes there right after that medical emergency, right? And she says she needs a wheelchair to go. But then when she gets home, she gets out of the car and walks into her house. So those are the inconsistencies that this court noted. I think inconsistency, how the drive itself, was that actually inconsistent? I thought one of the doctors said she shouldn't sit for more than 90 minutes. Well. And I understood the drive to be a drive where she got out part of the way there, and the drive wasn't over three hours. And coming home, she drove straight home. The surveillance person. Do we know that she drove straight home? Yes, that's in the record. The surveillance person said they went through their notes, and she drove straight home without stopping. So that was two hours. That's two hours. And Dr. Egan, by the way, there's some different, if I may finish this point, there's some different opinions. But Dr. Egan at one point said she could only sit for one hour. So even looking at that one hour, she's over what she did. But what I really think we have to focus on is this is what she told Dr. Bupalam. Not day-to-day or sometimes. She told Dr. Bupalam, I can't stand still without support. I need assistance in all activities of daily living, including going to the toilet. Mr. Bader, you're eating into your bottle. I understand that, but I would like to finish this point. But that's not, and also she said that she needed to be carried to bed. That's not the Ms. Gross that you see on the surveillance, aside from that one day when there may have been other circumstances, when she's walking with no problem at all, even taking jogging steps. She's spending an hour at the Kmart store shopping, bending down, which her doctor said she can't do. All of these are inconsistent with what her doctor said she could or could not do, and what she told Dr. Bupalam she needed, that she couldn't even get up on her own to go into bed. That's not the real Ms. Gross. The real Ms. Gross is the one that you see on the surveillance. I will use the remainder of my time on the rebuttal. Thank you. Good afternoon. May it please the Court. My name is Jonathan Feigenbaum. I represent Mrs. Gross. I'd like to focus my time on the two arguments on cross-appeal. Counsel, I wonder if at the outset you certainly should do that, but I would like to ask you why there's no letter from Dr. Egan here. We specifically noted that issue in the previous decision. It wasn't required, for sure. It wasn't required, but it would seem it would have been prudent to take note of what we said there and submit a letter from Dr. Egan, but there's no letter here. I agree with the Court. My understanding, since I didn't deal directly with the doctors in Kentucky, but my co-counsel did, is that an attempt to communicate with, or whatever attempts he made to communicate with Dr. Egan were unsuccessful. And I think it was because Ms. Gross had ceased seeing her as a patient quite a few years ago. Diana Gross was treating with her 2006-7. I don't recall off the top of my head how much passed then. And like a lot of physicians, frankly, they can't stand dealing with these disability claims. So often it just isn't easy to get treating physicians to cooperate. It may seem counterintuitive, but it's the reality in doing the plaintiff's side work. Some doctors are cooperative. Others just aren't. And I'd also point out, I mean, if the Court had said in the remand, this is absolutely 100% mandatory, it would have been done. But the case took on sort of its own life on remand, as Sun Life essentially tried relitigating the entire case. That's sort of a long-winded answer, but those are the facts. So Mrs. Gross's cross-appeal is on two issues. First, the interest rate. The Court set the interest rate at the weekly average of one-year constant maturity, which as of the date of the judgment, July, I think it's 8th, 2016, was an interest rate of 0.46%. At that time, Mrs. Gross was owed over nine years of benefits. As of now, her first benefit payment should have been January of 2007. And we had argued below with explaining why an interest rate, what we had asked for was the Massachusetts 12% simple interest rate, which actually matches a Kentucky rate of 12% for bad faith insurance denials, was appropriate. And I suggest that because the District Court did not give any explanation as to why the District Court chose the federal funds rate, that's my shorthand term for it, the federal funds rate, that was an abuse of discretion. The Court should have explained at some level why the Court was choosing this low rate. We'd also proffered information, and it's before this Court too, showing that Sun Life... I'm sorry, Your Honor. I'm sorry. So are you saying that the District Court abused its discretion or are you saying that the Court was erroneous as a matter of law? The Court abused its discretion because under ERISA, the law is clear there. Choosing the interest rate is at the discretion of the Court, but I suggest not explaining the reason is an abuse of discretion when there's no grounds provided, particularly that Mrs. Gross had argued in some level of detail as to why a certain rate should have been chosen. There's a prior decision in this circuit that I think illustrates the point very well. It had to do with Eaton Vance not making, I think it was 401K contributions, and the circuit remarked and said, look, if you don't set an interest rate that is certainly reasonable to make the plaintiff whole, it almost incentivizes a fiduciary to take its chances and not pay certain amounts of money that are due. Since ERISA's purpose in terms of providing interest, it's twofold. It's one, make the plaintiff whole. Two, and essentially to force the defendant to disgorge any ill-gotten gains. So you want us to remand for an explanation? Excuse me, Your Honor? Are you asking that we remand to the District Court to provide an explanation? Unless this Court would set the interest rate, which I doubt it would, I think that, yes, a remand on the interest rate would be appropriate. Mrs. Gross has not been paid for 10 years, and to make her whole and to make sure that Sun Life is not getting away with something that it shouldn't, Sun Life would provide information before this Court, the District Court, that Sun Life says its average return on equity is at 12%. Counsel, if we were to consider a remand, would you think that we should ask the District Court to address the conduct of your colleague in dealing with, I'm sorry, I'm not pronouncing the name correctly, but he was demanding that Dr. Bullapalm, I believe, Bullapalm, Your Honor. Thank you. Excuse me, that in a pretty aggressive way, was sort of demanding that he withdraw the addendum that he had provided to Sun Life. There is something troubling about that, and the District Court paid no attention to that, I think. I agree the behavior was rude. Maybe it could go as far as boorish. Is it sanctionable? I don't think so. I don't think the interest rate, though, has to be tied to whether or not. I'm not suggesting that they're in any formal way related, but how do you defend that conduct? Personally, I would not have engaged in that conduct. I have a different way of practicing law. His conduct, I don't think, is unlawful. It may be toeing the line of what I'm going to call boorish behavior, but rude behavior, boorish behavior is not necessarily sanctionable, and I don't think it crossed that line. I agree with your characterization that the letter may have been aggressive, but that doesn't make it sanctionable. How can you just demand that a doctor withdraw an addendum that you as a litigant don't write, and if you don't respond to my demand, here is the lawsuit that I'm going to file? Because I think the context of the addendum was not just an addendum. I've changed my opinion. It was defamatory. That was the position, basically suggesting that Mrs. Gross was some type of phony or pulled a fast one on him. It would have been different, Your Honor. I reckon it's complete. Yes. It's statements of physicians that they repeatedly overstated, but there certainly are a number of physicians here who felt that she was exaggerating her symptoms, and that's, I think, essentially what this doctor was saying as well. I sort of quarrel, Your Honor, respectfully with your characterization. I don't think the Dr. Bopolam had said, I withdraw my opinion after reviewing this video evidence. I do not believe that she is totally disabled. That would have been fine. I think the opinion goes beyond that, and I also suggest that I don't believe the record shows that other doctors, except these reviewing physicians, questioned her veracity. She was examined, I believe, by two Social Security physicians, and even her own treating physician at the time, Dr. Egan, never said, you know, I smell something phony here. And it's not uncommon in doing ERISA litigation that somehow, magically, all the reviewing physicians find there's nothing the matter with the person that they never examined, or they're, quote, self-reporting famous lines about pain. Of course we all self-report pain. There's no machine that can measure pain. But I hear this all the time. The pain's self-reported. Of course it is. But these reviewing physicians come up time and time and time again in the same files, and there's a reason they're being hired. So anyway, I hope I answered your question, again, a little bit long-winded. So the other issue that I wanted to focus on was the attorney's fees. The district court essentially cut the attorney's fees by two-thirds. I know it's not a good use of the time because it's in the briefs in terms of specific categories where there was major reductions of attorney time, but I'd suggest there seemed to be an overarching theme, which was as follows. Mrs. Gross, you appealed three issues to the circuit. The first was whether or not the plan fit under the safe harbor. Number two, the standard of review. And number three was should Mrs. Gross be awarded benefits on the merits. And the district court made some comment in the fee decision as follows. Well, on question one, Mrs. Gross lost. And it obviously wasn't a close call because this court spent maybe a third, almost half the opinion going over what was the law that was sort of settled in Johnson versus Watts regulator about what fits under the Department of Labor exemption. As to the standard of review, that was an absolutely major decision. Here we were 25 years after Firestone, and this court said enough is enough. Plans, if you don't draft clear language explaining that the plan has discretionary review, we're not going to countenance that anymore. That provided, I would say, huge relief across the board for every plaintiff in the First Circuit. I'm on the losing side of Stephanie C. But Stephanie C., on its first trip up to the First Circuit, was reversed, essentially because of the Gross decision. The First Circuit concluded that under Gross, Blue Cross didn't have discretion in its plan. It's just an example of how monumental that decision was. And then the district court also said, as to count three, well, it's neutral, you really shouldn't get paid for your time, because you didn't win the case on the merits, which seemed to sort of adopt what I'll call in the Gross 2 opinion Justice Sillia's dissent, suggesting that prevailing plaintiffs on a remand only shouldn't be paid. And I'd also suggest this, too. The case I'm calling Gross 2, where the panel was split, on the fee decision, that was the first time since Hart that a circuit court had ruled with clarity that a remand only would likely entitle a prevailing party to attorney's fees. So the two Gross decisions, when taken together, are very significant decisions of arrested jurisprudence. And it just didn't seem correct or fair or reasonable for the district court to essentially slash the attorney's fees by two-thirds. The relief that, reiterating, but the relief that was afforded across the board to all planned participants in the First Circuit, due to the Gross 1 decision, finally clarifying the standard review, and also making it more probable that prevailing plaintiffs, or it's not even a prevailing party statute, but that winning plaintiffs would likely recover attorney's fees, provides a great deal of relief to people that don't have ready access to the court. Since you were on Stephanie, what do you think our standard of review is for review of the claim? De Novo. Judge Selya, in the opinion, when he wrote it, or I'll refer to the court, when the court wrote the opinion, there was a lot of, the first half of the opinion is, we'll just say a discussion, about the murky standard. The court ultimately concluded that it would decide the case De Novo.  I suggest this. Look at it very, very carefully. Because the court, from the losing perspective's side, decided the case really as if it was discretionary review. Because the court said, well, the facts are complicated, and we think Blue Cross's decision is reasonable. And reasonable is a term that I connect with discretionary review. So I agree with my colleague, Mr. Bachrach, that the case could be before this court on clear error, where you have a stipulated record that there is no dispute on the facts. And this is not a case where we have a stipulated record. Or you have a decision where the court made findings under Rule 52. Those could be reviewed for clear error. But I think to step out now and decide this case, even though it would be advantageous, probably to Mrs. Gross, to have the case decided on clear error, I think that's a real departure from existing law. And again, in Stephanie C., the court ultimately said it was deciding the case De Novo. So are the other circuits consistent with that? I'm unaware of any circuit that decides a case for clear error. The Fifth Circuit has some. Because, for example, take the Seventh Circuit. Seventh Circuit says to the district court judges, make independent findings of fact. I think the Eleventh Circuit, on occasion, does it. It depends on which district court you're in. But I'm unaware of any circuit, at this point, that is holding on cases that are bubbling up through the strange summary judgment procedure, that their cases are being decided at a standard of clear error, unless the parties stipulate to the record or the district court makes findings of fact under Rule 52. The Fifth Circuit has some strange hybrid dealing with whether or not facts are reviewed discretionary anyway. Thank you. Can I just take a minute to defend the district court's decision on the merits? Sure. The district court looked at the same evidence as before and decided that the medical evidence was overwhelming that Mrs. Gross was disabled. If you think about a case such as McDonough v. Aetna, no analysis was ever done by Sun Life based on the medical evidence that said that Mrs. Gross could fulfill her duties as an optician. The district court, in its rather short opinion, did find that the medical evidence was strong enough to support that she was unable to work in her own occupation, it was corroborated by social security finding, and the court found that sufficient. Thank you. Excuse me. With all due respect, that explanation was about the same as the evidence that was provided by a plaintiff during the remand. It doesn't answer the questions that this court asked them to answer. What about on the attorney's thesis? When you appeal, you're trying to get a result. You've got your best argument, but you don't want to waive your other's. We always see alternative arguments being made. Why should compensation for a plaintiff, who is supposed to put in a similar position to the other side, have this cleaver taken to it and says, each little argument that you make that you don't win, we're going to pull that out? Because the Hensley case from the Supreme Court says that you should not recover on arguments that you've lost. That you're supposed to eliminate. But we already ruled in the decision that's binding on this panel, they did have success, i.e., they went back down and got averted. But that wasn't what was cut. The reasons, and I do want to get to the merits here, because that's the real issue here. I don't think you need to get to the fees or the interest, but the fact of the matter is that the judge made a thorough review. I understand. The judge made a thorough review. The judge cut the fees because the requested rate from Mr. Grabhorn was excessive. And that's why there's a substantial reduction in the rates he requested. The court cut the fees because it found duplicative work between two attorneys. The court cut the fees because it found in one instance that one of the attorneys billed time for preparing a pleading that was filed 11 days earlier. The court detailed the reasons why it eliminated certain fees. For example, the fees concerning the arguments against ERISA. They lost on that. So should they get, when they fought hard, they did fight hard on that, but they lost on it. Should they recover fees on that? No, they shouldn't. But I need, Your Honor, to get back to the issue here of the benefits. And it's their burden. It's their burden of proof. And this court, if the court thought that she met the burden before the remand, it would have just awarded benefits, and it didn't. And during the remand, they did nothing to move that needle over. They submit this report by Dr. Murphy, who makes conclusory statements that are contrary to the facts of this record. They rely on this report from Mr. Kaczmarek, who doesn't address his own inconsistent statements about her condition beforehand. So if she didn't cure. To some extent, you're mischaracterizing that decision. I think, fairly read, that decision indicates that the medical record, the paper evidence, was actually quite strong for reasons we indicated. You did have, for sure, the surveillance video that seemed, in some ways, incompatible with some aspects of that record evidence. And we were troubled by that, and we asked the parties to address it on remand. But you're suggesting, I think, that the case hinges entirely on an evaluation of the surveillance video. That seems to be a considerable overstatement. It's somewhat of an overstatement. But Your Honors have said, and even in this case, if I may finish this answer, that surveillance evidence can be sufficient to deny a benefit claim when it's inconsistent with the claims being made, which is the situation we have here. And she did nothing during the remand to address those inconsistencies. If I could, Your Honor, because it's an important point, if I could address one more point, please. Judge Johnson, thank you. The issue with Dr. Bupalam and Mr. Grabhorn's interference, counsel says that's not sanctionable. But it was in the other case in which he did the exact same thing in Kentucky, and he was sanctioned for doing it. It is sanctionable behavior. And we cite to that case it's Grove versus Standen in our brief. But here's the other fact that he's lost track of, and that is we reached out to Dr. Bupalam. Judge Lopez, you said, did any of the other doctors comment on the fact that there was this inconsistency, or did they know that she went to see her mother who had been taken to the hospital ill? We tried to get that from Dr. Bupalam, and it's in the record he refused to cooperate because he was threatened. That's sanctionable. In fact, that should probably even bar the claim. That is reprehensible behavior, and the district court should have addressed it. We think the entire decision needs to be reversed, Your Honor, and that's what we're asking this court to do. Thank you.